UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **EDWARD GALLAGHER, et al.,** | Civil Action No. 10-5811 (AET) |
| **Plaintiffs,** | |
| v. | MEMORANDUM OPINION |
| **BOROUGH OF SEASIDE PARK, et al.,** | |
| **Defendants.** | |

**BONGIOVANNI, Magistrate Judge**

1. **Introduction**

    Before the Court is the Defendants' Borough of Seaside Park, and others, (singularly, the "Borough" and collectively, the "Defendants") Motion to Enforce a Settlement. [Docket Entry No. 25]. The Defendants wish to enforce a settlement-agreement allegedly reached by the parties between May of 2013 and October of 2013. The Plaintiffs, Edward Gallagher and Edith Gallagher (collectively, the "Gallaghers" or "Plaintiffs") oppose Defendants' Motion, arguing that there was no settlement-agreement reached between the parties. [See Generally Docket Entry No. 27]. Alternatively, they argue if there was a settlement, the easement contained in the settlement cannot be imposed on the Plaintiffs because it is barred by the Statute of Frauds. [Docket Entry No. 27].

    The Court considered the Motion without oral argument pursuant to L.Civ.R. 78.1. After fully considering all papers submitted in support of, and in opposition to the Motion, and for the reasons stated more fully below, Defendants' Motion to Enforce a Settlement is hereby GRANTED.

2. **Procedural and Factual Background**

The lawsuit underpinning the alleged settlement-agreement was filed on November 9, 2010 and concerns the Borough of Seaside Park's allegedly illegal removal of "no-trespassing" signage posted by the Plaintiffs on a piece of their riparian land running adjacent to the K Street bulkhead, in the southeast corner of an alcove along the banks of the Barnegat Bay, in Seaside Park, New Jersey. [*See generally*, Docket Entry No. 25.] The riparian land owned by the Plaintiffs abuts the southwest corner of the Plaintiffs' home and attached marina, and runs the length of the adjoined K Street bulkhead, for a distance of 1100 feet. [Docket Entry No. 27, p.5]. The Plaintiffs have owned their property in Seaside Park since 1994, prior to the development of the K Street bulkhead. [Docket Entry No. 27-8]. Also since 1994, the Plaintiffs began leasing the use of their dock and boat slips to the owners of small boats and other watercraft. [Docket Entry No. 27, p. 5].

However, in 2002, the Borough made improvements to the area of K Street contiguous with the southern boundary of the Plaintiffs' property. [Docket Entry No. 27, p. 5]. Specifically, the Borough developed the residential area immediately south of K Street, and purchased a piece of the Plaintiffs' property, approximately 3 x 1100 feet in size, to install the K Street bulkhead. [Docket Entry No. 27, p.5]. After the completion of the improvements in 2003, the Plaintiffs alleged the public would regularly cast fishing lines and crab traps into the riparian area along the K Street bulkhead, fouling the propellers of watercraft that were launched from the Plaintiffs' dock. [Docket Entry No. 27, p.5].

To alleviate this problem, the Plaintiffs and the Borough entered into a temporary agreement between June 26, 2003 and September 14, 2003 to curtail the public's use of the K Street bulkhead for fishing and crabbing. [Docket Entry No. 27, ex. C]. The agreement specified the Borough would only allow the public to fish and crab in the area between two non-

public "buffer zones." [Docket Entry No. 27, ex. C]. The first buffer zone extended 100 feet outward from the endpoint of the Plaintiffs' dock, and the second buffer zone extended 50 feet inward from the West end of the K Street Bulkhead. [Docket Entry No. 27, ex. C]. Similarly, the Borough agreed to place the appropriate "no-fishing or crabbing" signage in these buffer zones to notify the public of this restriction. [Docket Entry No. 27, ex. C]. The Borough also subjected the permissible fishing and crabbing area to an ordinance preventing fishing and crabbing after 9:00 p.m. and before 9:00 a.m. [Docket Entry No. 27, ex. C]. The agreement last specified that the Plaintiffs: 1.) Were not to post their own signage; 2.) Would remove any pilings or poles placed in the riparian area; 3.) Would receive a $450.00 reimbursement for the survey costs to demarcate the buffer zones; and 4.) Would generally cooperate with the Borough to maintain the bulkhead and adjoining areas through the duration of the agreement. [Docket Entry No. 27, ex. C].

Although this temporary agreement was intended to end on September 14, 2003, the terms of the agreement apparently continued to be enforced. [Docket Entry No. 27, ex. D]. On November 8, 2007 the Plaintiffs wrote the Borough a letter complaining that the temporary agreement had not fully solved the fouling of propellers, and introduced three additional concerns. [Docket Entry No. 27, ex. D]. Specifically, the Plaintiffs complained that: 1.) They had seen men urinating into the bay; 2.) Crabbing and fishing activities were occurring during the hours prohibited by the ordinance; and 3.) The public was using the bulkhead area as a park, and allowed their children to litter in the bay. [Docket Entry No. 27, ex. D]. To remedy the problem, the Plaintiffs requested the Borough eliminate the bulkhead area for crabbing and fishing use altogether, and/or to move these public uses to a nearby marina area, away from the Plaintiffs' property. [Docket Entry No. 27, ex. D]. Between November 8, 2007 and May 27, 2010, the

Plaintiffs continued to have problems and sought redress from the Borough council, met with Councilman David Meyer and Police Chief Dickson, and called the police on multiple occasions. [Docket Entry No. 27, ex. D].   Additionally, the Plaintiffs placed "no trespassing" signage and purportedly cut fishing and crab lines in the buffer area.   [Docket Entry No. 27, ex. D].   This allegedly caused the relationship with the Borough to become antagonistic, punctuated by the Borough's filing of a formal objection to the Plaintiffs' application to expand their dock with the New Jersey Department of Environmental Protection.   [See Docket Entry No. 27, ex. F, no(s). 7, 16].   On May 27, 2010, the Borough first became aware of the signage posted on the Plaintiffs' property, and on May 31, 2010 entered the Plaintiffs' property and removed it.   [See Docket Entry No. 27, ex. F].

This act caused the Plaintiffs to file the instant November 9, 2010 lawsuit, alleging federal civil rights violations, as well as supplemental state law tort claims.   [Docket Entry No. 27, ex. G].   Following a lengthy discovery period, the Honorable Magistrate Judge Tonianne J. Bongiovanni held a settlement conference on May 17, 2013.   [Docket Entry No. 25].   During that settlement conference, counsel for the parties conferred and reached a tentative settlement, pending client approval.   [Docket Entry No. 25].   Thereafter, on June 12, 2013, the Defendants wrote to the Plaintiffs "confirm[ing] that the Defendants […] agree to a full and final settlement of the above matter, as discussed at the May 17, 2013 Settlement Conference."   [Docket Entry No. 25, ex. A].   Specifically the Defendants proposed,

> The parties will enter into a settlement agreement that provides as follows,
> 1. The public would be prohibited from crabbing or fishing in the Gallaghers' tideland area along K Street beginning at the western bulkhead and extending west for a period of 250 feet measured from the western end of the Gallaghers' longer dock. Representatives from the parties will meet on the site to delineate the area. The public will be permitted to use the adjoining upland area, adjacent to K Street, for walking, sitting, etc.
> 2. The public will be permitted to crab and fish along K Street for its remaining length to

> the west of the 250 foot area noted in paragraph 1 above. The Plaintiffs will not interfere with the public's use of this area.
> 3. The Borough of Seaside Park will post signage delineating the no fishing/crabbing area.
> 4. In the area where fishing and crabbing is permitted, fishing and crabbing will be regulated by Borough Ordinance, which at present provides that those 12 years of age and older require a beach badge for fishing and crabbing during the hours when beach badges are offered for sale, and allows fishing and crabbing between the hours of 9 a.m. and 9 p.m.
> 5. The Borough of Seaside Park will advise DEP in writing that the Borough no longer objects to the Gallaghers' pending application for a waterfront development permit authorization for legalization of existing dock and extension of dock, installation of two jet ski ramps.
> 6. The Agreement will be binding on the parties, their heirs and assigns. The Gallaghers will record a deed notice in a form acceptable to the Borough acknowledging that fishing and crabbing is prohibited in the 250 foot area described in paragraph 1 above and permitted in the remaining area described in paragraph 2 above. See, e.g., N.J.S.A. 13:8B-1 et seq.
> 7. The parties will exchange mutual general releases, including, but not limited to all claims for money damages, legal fees and litigation costs.
> Please confirm whether this is acceptable and I will prepare a final Settlement Agreement and deed notice. [Docket Entry No. 25, ex. A].

The Plaintiffs corresponded to this letter on August 8, 2013. [Docket Entry No. 25, ex. B]

as follows:

> Please let this correspondence serve as Plaintiff's counter to resolve all claims as to all parties. I will refer to the enumerated items in yours dated June 12, 2013 for ease of reference.
> 1. Plaintiff agrees with this term. We propose that a surveyor be utilized for delineation of the "no fishing and crabbing zone" at Seaside Park's expense.
> 2. We agree to this term.
> 3. We agree to this term.
> 4. We agree to this term. Law enforcement should be instructed to enforce this badge provision throughout the entire duration of the 12 hour period whereby fishing and crabbing is permitted. In the past, police have not enforced the badge requirement set forth in the Ordinance after the beaches are closed and badges are not available to the public for purchase.
> 5. We agree to this term.
> 6. We agree to this term.
> 7. We agree to this term.
> The Plaintiff hereby demands these terms to be part of the agreement:
> 1. A lump sum payment of $5,000.
> 2. An (sic) proposed amendment to the Borough Ordinance referenced in the number 4 of your June 12, 2012 letter should be raised and considered during a council meeting. The

proposed amendment should state that no commercial fishing or crabbing may take place in the water adjacent to the K Street bulkhead and that, with respect to crabbing, only five traps may be dropped in the water simultaneously at a time by any individual participating in the activity.
3. An agreement that the K Street channel be swept for debris and stray traps annually.
Please present this proposal to the powers that be at the Borough and inform us of the decision. Thank you for your time.
[Docket Entry No. 25, ex. B].

Thereafter on September 6, 2013, the Plaintiffs wrote to Judge Bongiovanni stating: "Please be advised that the parties have resolved this case, but wish to continue with this afternoon's teleconference to discuss the terms of the settlement with the Court and to request that the appropriate 60 Day Order be entered. Thank you for your time." [Docket Entry No. 25, ex. C]. Pursuant to this letter, a 60 Day Order was entered by the Honorable Anne E. Thompson on September 11, 2013 which stated:

> "It appearing that it has been reported to the Court that the above-captioned matter has been settled, It is on this 11th day of September 2013, ORDERED that this action be and is hereby dismissed, without costs and without prejudice to the right, upon good cause shown within 60 days, to reopen the action if the settlement is not consummated. The Court shall retain jurisdiction over this matter for the purpose of enforcing the settlement." [Docket Entry No. 25, ex. D].

Thereafter on October 8, 2013 the Defendants sent the Plaintiffs a packet of settlement materials containing four documents: 1.) A Settlement Agreement and Release (the "Release"); 2.) A draft letter to the New Jersey Department of Environmental Protection withdrawing the Borough's formal objection to the expansion of the Plaintiffs' dock; 3.) A proposed Conservation Restriction/Easement (the "Easement"), and; 4.) An enclosed letter stating:

> Enclosed herewith please find a Settlement Agreement and Release and a Conservation Restriction/Easement in the above matter. If acceptable, please have the Settlement Agreement and Release signed by the Gallaghers and witnessed; please have the Conservation Restriction/Easement signed and notarized. Please return both documents to me, which I will hold in escrow pending delivery of the $5,000.00 settlement payment. [Docket Entry No. 25, ex. E].

The Release set forth nine terms of settlement. [Docket Entry No. 25, ex. E]. Specifically, it incorporated the aforementioned seven enumerated points, a provision giving the Plaintiffs' the $5,000.00 lump sum payment they demanded in their August 8, 2013 letter, and a stipulation that the Plaintiffs' lawsuit would be dismissed. [Docket Entry No. 25, ex. E]. Similarly, the "Representations, Warranties and Covenants" paragraph of the Release likewise stated "Plaintiffs and Defendant further represent, warrant, and covenant to each other that the execution and delivery of this Agreement has been duly authorized by Plaintiffs and Defendant and that no other action is requisite to the validity, binding execution and delivery of this Agreement." [Docket Entry No. 25, ex. E].

The Easement stated that Plaintiffs', were to be the Grantors of a "conservation restriction" as defined by the New Jersey Conservation Restriction and Historic Preservation Restriction Act N.J.S.A 13:8B-1, *et seq*, restricting public access to the 250 buffer area. [Docket Entry No. 25, ex E, ex. B]. Similarly, "the easements, covenants, and restrictions" set forth in the document were "to run with the land and are binding upon the Grantor, its agents, representatives, successors, heirs, assigns and all parties having or acquiring any right, title or interest in the Property, or any part thereof." [Docket Entry No. 25, ex. E, ex. B]. The Easement concluded that the Defendant was to "have and to hold, for its successors and assigns forever. The covenants […] imposed with this Conservation/Restriction Easement shall not only be binding upon the Grantor but also its agents, representatives, assigns and all successors to it in interest, and shall continue as a servitude running in perpetuity with the land referred to herein as the Property." [Docket Entry No. 25 ex. E, ex. B.]

However, the Plaintiffs never signed this packet of settlement materials. Instead, on January 14, 2014, 98 days after the informing the Court that a settlement had been reached, the

7

Plaintiffs wrote a letter to Judge Bongiovanni explaining that, although the time period in which to reopen the case had expired, the October 8, 2013 Release contained uncertain language as to the length of time of the easement in question and which party would in fact be the grantor of the easement. [Docket Entry No. 25 ex. C]. Following an unproductive telephone conference on January 24, 2014, of which a transcript is not available, the Defendants filed the instant motion, on May 5, 2015.

**3.      Analysis**

Federal courts look to state contract law when determining whether an enforceable settlement agreement has been reached. See *Dep't of Pub. Advocate v. N.J. Bd. of Pub. Util.*, 206 N.J. Super. 523, 527-28 (App. Div. 1985); *Excelsior Ins. Co. v. Pennsbury Pain Ctr.*, 975 F.Supp. 342, 348-49 (D.N.J. 1996) (holding that "state law governs the construction and enforcement of settlement agreements in federal court."). Under New Jersey state law, "[a]n agreement to settle a lawsuit is a contract which, like all contracts, may be freely entered into[,] and which a court, absent a demonstration of 'fraud or other compelling circumstances,' should honor and enforce as it does other contracts." *Pascarella v. Bruck*, 190 N.J. Super. 118, 124-25 (App. Div. 1983) (internal quotations omitted). [P]arties may orally, by informal memorandum, or by both[,] agree upon all the essential terms of the contract and effectively bind themselves thereon, if that is their intention, even though they contemplate the execution later of a formal document to memorialize their undertaking. *Bistricer v. Bistricer*, 231 N.J. Super. 143, 147 (Ch. Div. 1987) (quoting *Kupper v. Barger*, 33 N.J. Super. 491, 494 (App. Div. 1955)). So long as the basic essentials [of the settlement] are sufficiently definite, any gaps left by the parties should not frustrate their intention to be bound." *Bistricer*, 231 N.J. Super. at 148. "Indeed, as long as those essential terms are agreed to, 'the settlement will be enforced notwithstanding the fact that a writing does

not materialize because a party later reneges.'" *Id.* (quoting *Lahue v. Pio Costa*, 263 N.J. Super 575, 596 (App. Div. 1993)). Additionally, the settlement of litigation ranks high in the public policy of New Jersey. See *Lahue v. Pio Costa*, 263 N.J.Super. 575, 581 (App. Div. 1993). Therefore "Courts will strain to give effect to the terms of a settlement whenever possible." *Dept. of Public Advocate v. N.J. Bd. Of Public Utility*, 206 N.J.Super. 523, 528 (App. Div. 1985).

Applying these principles it is evident that the parties reached an enforceable settlement agreement. Even assuming no oral agreement was reached during the May 27, 2013 settlement conference, the Plaintiffs affirmatively expressed their intent to be bound to the seven enumerated points in the Defendants' June 12, 2013 letter. Specifically, in their August 8, 2013 reply to the Defendants, the Plaintiffs stated they "agreed" to the seven aforementioned terms, which is no different from stating the Plaintiffs intended to be bound by these terms. Similarly, the Plaintiffs' intent to be bound is further evidenced by the Plaintiffs' September 6, 2013 letter to this Court stating that the case had been resolved.

The Plaintiffs argue that instead of manifesting their intent to be bound, the August 8, 2013 response to the Defendants was a counter-offer. A counter-offer operates as a rejection because it implies that the offeree will not consent to the terms of the original offer and will only enter into the transaction on the terms stated in the counteroffer. *Berberian v. Lynn*, 355 N.J. Super. 210, 217 (App. Div. 2002); quoting 1 *Willinston on Contracts* § 5.3 (4th ed. 1990). "A counteroffer terminates the power of acceptance when it relates to the same matter as the original offer and proposes a "substituted bargain differing from that proposed by the original offer." *Berberian* 355 N.J. Super at 217; quoting *Restatement (Second) of Contracts* § 39(2), comment a (1981). Although the Plaintiffs argue their August 8, 2013 correspondence was a counter-offer, it is clear that the Plaintiffs corresponded with the intent to be bound because the Plaintiffs did not attempt

9

to substitute a bargain by changing the actual substance of the aforementioned seven terms nor did Plaintiffs make the acceptance of the original terms conditioned upon the acceptance of the additional terms he proposed. Although Plaintiffs proposed three additional terms, they did not state in the correspondence or during the subsequent settlement conference, that the Plaintiffs' acceptance of the whole agreement was conditioned upon the acceptance of their proposed three additional terms.   In short, were Plaintiffs' correspondence intended by the Plaintiffs to operate as a counter-offer, that a counter-offer would be viewed as a rejection of the Defendants' June 12, 2013 letter and, in the absence of another offer from the Defendants and acceptance by the Plaintiffs, then no agreement would have been reached.   If so, then Plaintiffs would not and should not have represented to the Court that the case had settled.

In addition to the affirmation of their intent to be bound, the Plaintiffs had ample opportunity to notify the District Court that the Plaintiffs did not intend to be bound, or that a settlement had otherwise not been reached. Neither party has indicated in the briefing that the Plaintiffs balked at the terms of settlement at any point between the May 17, 2013 settlement conference and the September 6, 2013 telephone conference. The Plaintiffs likewise failed to request an extension of the 60-day period as set forth in the 60 Day Order, or otherwise report that the settlement was not agreed to in the month between the time they received the settlement agreement packet on October 9, 2013, and the expiration of the 60 day time period on November 11, 2013. If the Plaintiffs had no intention to be bound by the negotiated terms, they should have made this fact known to the Court instead of knowingly remaining silent while the 60 day time period set by the District Court's September 11, 2013 Order ran out.   An objection to the settlement is notably omitted in the Plaintiffs' January 14, 2014 correspondence to this Court. In that correspondence, the Plaintiffs again had the opportunity to state no agreement had been

reached but instead, the Plaintiffs only requested the Court's guidance in how to proceed regarding alleged vagueness in the terms contained in the Release.

Additionally, the Court finds questionable the concerns contained within Plaintiffs' January 14, 2014 correspondence about vagueness in the language of the Release. While the Release only stated "Plaintiffs will execute Deed Notice in the form attached hereto as Exhibit B," the Release specifically incorporated the Easement by reference, which was sent concomitantly with the Release. The Easement fully explains both who will be granting the easement, and how long the easement will last. Specifically, the attached Easement stated that Plaintiffs', were to be the Grantors of the easement and that "the easements, covenants, and restrictions set forth in the document were to run with the land and are binding upon the Grantor, its agents, representatives, successors, heirs, assigns and all parties having or acquiring any right, title or interest in the Property, or any part thereof" and that the […] [t]he covenants […] [i]mposed with this Conservation/Restriction Easement shall not only be binding upon the Grantor but also its agents, representatives, assigns and all successors to it in interest, and shall continue as a servitude running in perpetuity with the land referred to herein as the Property." [DE 25 ex. E ex. B.] Therefore, the Court finds that the essential terms of the contract were clear, and that at the time of the settlement both parties had an intent to be bound. The Court finds, in sum, the Plaintiffs hesitations are not a symptom of a lack of intent to be bound, but rather dissatisfaction with the deal after having ample time to reflect on its terms.

Plaintiffs argues that even if the Court finds that the parties intended to be bound, creating an enforceable agreement, that the Court cannot impose the Easement contained in the Defendants' October 8, 2013 settlement packet, because the Easement does not comply with the Statute of Frauds.

11

New Jersey Statues Annotated ("N.J.S.A.") 25:1-13, otherwise known as the Statute of Frauds, governs agreements to transfer an interest in real estate. An interest in real estate includes an easement. N.J.S.A. 25:1-10. A transfer of an interest in real estate includes the creation of an interest in real estate. *Id.* Therefore, because the proposed deed notice would create an easement in favor of the Defendants, it is a transfer of an interest in real estate and therefore must comply with the Statute of Frauds. The Statute of Frauds provides in relevant part that an agreement to transfer an interest in real estate shall not be enforceable unless: (a) a description of the real estate sufficient to identify it, the nature of the interest to be transferred, the existence of the agreement, and the identity of the transferor and transferee are established in a writing signed by or on behalf of the party against whom enforcement is sought; or (b) a description of the real estate sufficient to identify it, the nature of the interest to be transferred, the existence of the agreement and the identity of the transferor and the transferee are proved by clear and convincing evidence. N.J.S.A. 25:1-13.

While the Statue of Frauds generally requires a signed writing, "[c]ourts will permit[] the enforcement of an oral agreement to sell an interest in real estate." *Morton v. 4 Orchard Land Trust*, 180 N.J. 118, 125 (2004). "The focus of inquiry in a situation involving an agreement for the sale of an interest in real estate should be whether an agreement has been made between the parties by which they intended to be bound." *Morton*, 180 N.J. at 125. In determining whether the parties intended to enter into a binding agreement, Courts may examine: (1) the circumstances surrounding a transaction; (2) the nature of the transaction; (3) the relationship between the parties; (4) the parties' contemporaneous statements; and (5) the parties' prior dealings. *Id*. at 126. When the agreement has not been reduced to writing a high standard of proof must be met to establish that intent…specifically, clear and convincing evidence. *Id.* Evidence is clear and

convincing when it "produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Loder v. Neppl*, WL 4118310, at *4 (N.J. Super. Ct. App. Div. Nov. 21, 2007); citing *In re Purrazzella*, 134 N.J. 228, 240 (1993).

The Plaintiffs cite the case of *Prant v. Sterling*, 332 N.J. Super. 369, 378 (ch. Div. 1999), aff'd o.b. 332 N.J. Super. 292 (App. Div. 2000) to support their contention that the Plaintiffs intended to be bound only by a formal writing, and that no formal writing exists to satisfy the Statue of Frauds. *Prant* is distinguishable from the instant case for several reasons. In *Prant*, the trial court granted summary judgment in favor of the seller-defendant, finding that the parties did not enter into an oral contract of sale of an interest in real estate. *Prant*, 332 N.J. Super. at 380. The first critical difference is that the property held in trust in *Prant* was subject to a 50% control stake of two co-trustees, and one trustee did not agree to sell the property. Specifically, the second co-trustee, Fleet Bank, required their Real Estate Administration Committee (REAC) to approve all sales of trustee property; and this pre-requisite approval was clearly indicated to the plaintiff. Although the plaintiff stated the REAC's representative's diary entry that the deal "was definite" and that the other co-trustee was in agreement was clear and convincing evidence to satisfy the Statute of Frauds, the Court stated that the REAC was simply not bound to follow the representative's word. Second, due to the complexity of the three million dollar transaction in *Prant*, the evidence clearly demonstrated that the parties intended to be bound only by a formal contract. Specifically, the parties in *Prant* negotiated the essential terms of the contract over the course of five months and exchanged proposals and counter-proposals over seven times. With each of these proposals and counter-proposals, the essential terms of the contract changed, namely the price point and how many acres of land were to be purchased. While, during the final round of proposals and counter proposals, counsel for the defendants prepared the draft contract in

accordance with the plaintiffs' term sheet and forwarded it to the defendants' attorneys, co-trustees, and the family; that contract was accompanied by a letter stating that the draft contract had not been reviewed by defendants and was subject to their review. Thereafter, the attorneys for both parties continued to discuss objections to the essential terms of the contract until the defendant decided to sell the property to another buyer entirely.

In the instant case, the Plaintiffs clearly demonstrated the intent to be bound. As previously emphasized, the seven aforementioned essential terms of the contract remained identical and the Plaintiffs did not seek to substantially alter those terms in any way shape or form in their counter proposal. Additionally, the Plaintiffs' August 8, 2013 correspondence stated, "the Plaintiffs agree to this term," suggesting that the Plaintiffs had already formed the intent to be bound on those terms, and were simply notifying the Defendants of that fact.

The Defendants cite to *McBarron v. Kipling Woods, LLC*, 365 N.J. Super, 114, 115-16(2004) to support their position that clear and convincing evidence exists to prove the parties' intention to be bound by something other than a formal writing, and that this satisfies the Statute of Frauds. This Court finds the Defendants' case instructive. In *McBarron*, the Appellate Division of New Jersey reversed the trial court's grant of summary judgment in favor of a seller, who had withdrawn from an oral agreement for sale of property, finding a trier of fact could find by clear and convincing evidence that the seller had the intent to be bound when making verbal assurances that the parties "had a deal." *McBarron*, 365 N.J. Super at 118-19. The plaintiffs in *McBarron* were husband and wife buyers who claimed that an oral agreement to purchase property for $185,000 was formed during telephone conversations with Barry Jost, who was representing the seller, Kipling Woods, LLC. *Id*. at 118. The telephone conversations were the culmination of a long course of dealings between the parties that began in 1998. *Id*. at 117. On November

14

2, 2001, Jost called the husband at work and told him that the purchase price of the lot was $185,000. *Id.* at 118. The husband accepted and asked if the transaction was a "done deal," to which Jost replied, "definitely," and represented that the seller's attorney would "draw up" an agreement. *Id*. In subsequent phone calls between Jost and the plaintiffs, Jost acknowledged many times that that they "had a deal" and he would "honor it," but gradually began to renege on the plaintiffs after Jost received a significantly higher offer by a corporate entity. *Id*. The plaintiffs tape-recorded the conversation during which Jost repeatedly confirmed that they had a deal. *Id.* at 118–19. The Appellate Court noted that "the mere anticipation of a written memorialization of an oral agreement," provided that all the elements of a contract are present, "does not as a matter of law vitiate an oral contract." *Id*. at 116. The Court concluded that the buyers' proofs, specifically the multitude of oral assurances that the parties had in fact reached a deal, if credited by a trier of fact, would support by clear and convincing evidence a finding that the parties had entered into an oral contract for the sale of the lot. *Id.* at 119.

The instant case has more compelling evidence that the parties intended to be bound than *McBarron*, as there is written correspondence from the Plaintiffs indicating their intent. Specifically, the Plaintiffs demonstrated their intent to be bound by agreeing to the seven terms of settlement proposed by the Defendants in their June 12, 2013 letter. The Plaintiffs also demonstrated their intent to be bound by the deed notice when they stated they agreed to paragraph 6 of the June 12, 2013 letter. Moreover, the Plaintiffs last demonstrated their intent to be bound by indicating to the District Court that the case had settled on September 6, 2013, intended to be bound.

Consequently, this Court finds the parties had the intent to be bound and this satisfies the Statute of Frauds and that the Plaintiffs are bound by the conservation easement contained in the

October 8, 2013 settlement packet.

**4.    Conclusion**

For the reasons set forth above, Defendants' Motion to Enforce Settlement is GRANTED.

An appropriate Order follows.

Dated: December 14, 2015.

s/Tonianne J. Bongiovanni
TONIANNE J. BONGIOVANNI
UNITED STATES MAGISTRATE JUDGE
